Charles Leon **CHEATHAM**, Appellant,

v.

**STATE of Oklahoma, Appellee.**

No. F–90–649.

Court of Criminal Appeals of Oklahoma.

June 28, 1995.

Rehearing Denied Aug. 15, 1995.

418

Kurt Geer and Joel Porter, Asst. Public Defenders, Oklahoma City, for defendant at trial.

Greg Ryan and Charles Rogers, Asst. Dist. Attys., Oklahoma City, for the State at trial.

Catherine Clendenin Hammersten, Asst. Public Defender, Oklahoma City, for appellant on appeal.

Susan Brimer Loving, Atty. Gen. and A. Diane Blalock, Asst. Atty. Gen., Oklahoma City, for appellee on appeal.

*OPINION*

LANE, Judge:

Appellant, Charles Leon Cheatham, was charged with Murder in the First Degree (Malice Aforethought), or in the alternative, Felony Murder, and Robbery with a Dangerous Weapon, all After Former Conviction of Two or More Felonies. He was convicted May 24, 1990 of Felony Murder and Robbery with a Dangerous Weapon after a two-stage jury trial in the District Court of Oklahoma County, Case No. CRF–86–4869, before the Honorable James L. Gullett, District Judge. The trial court dismissed the robbery conviction as it was the basis for the felony murder conviction. After the sentencing stage proceeding, the jury recommended Appellant be sentenced to death, and the trial court sentenced accordingly. Appellant appeals, challenging both the guilty verdict and the sentence imposed for the crime. We affirm Appellant's conviction, but the sentence of death is vacated and the cause is remanded for resentencing.

## SUMMARY OF FACTS

On Thursday, September 4, 1986, at approximately 7:00 p.m., William L. "Bud"

Witherspoon was found bludgeoned to death in his home on the far northeast side of Oklahoma City, Oklahoma County. Witherspoon, a sixty-four year old white male, lived alone, but visited his wife, Delores, in a nearby nursing home every night between the hours of 6:30 and 7:00 p.m. Cindy and Marvin Terrell lived just down the road from Witherspoon, and saw him almost every day of the week. Cindy Terrell had known the Witherspoons since she was a child, and considered Witherspoon and Delores family members. She and Marvin routinely had breakfast or lunch with Witherspoon, and hired him to do odd jobs in their business. Delores had been placed in a nursing home some time previous to the murder, and Witherspoon was in the process of trying to find someone to care for her during the day so he could bring her back home.

Mary McKnight was a Certified Medical Aide (CMA) at Oak Hill Nursing Home where Delores was living, and knew Witherspoon from his frequent visits and inquiries as to Delores' daily condition. McKnight was able to control Delores, getting her to eat and take medicine when the other aides were unable to get her to cooperate, and Witherspoon thought she would be a good prospect for providing Delores' at-home care. McKnight arranged to meet with Witherspoon on Tuesday, September 2, 1986, to discuss the proposition.

Because her vehicle was not working, McKnight borrowed Appellant's car (a cream-colored Cadillac) to keep the appointment. (Appellant dated McKnight's sister, Alma Loudella Jarrahi.) Appellant picked McKnight up at a friend's house; she dropped him off at his sister's (a little over a mile away); McKnight met with Witherspoon somewhere between 11:15 and 11:45 p.m., and then returned to pick Appellant up between 1:00 and 1:30 a.m.

McKnight met with Witherspoon again the next day (Wednesday, September 3) somewhere between 3:30 and 4:20 p.m. Appellant and Charles "Big" Green dropped McKnight off at Witherspoon's house, and McKnight told the two to return for her in about forty-five minutes. Witherspoon had been drinking when McKnight got there and asked her to go to the liquor store in Jones, Oklahoma to get him some more Vodka. Witherspoon gave her a $100 bill and allowed her to take his truck, since she did not have a car.[1] McKnight met Appellant and Green at the liquor store, and the two followed her to Witherspoon's house because she was afraid she would run out of gas. Witherspoon met her in the front yard, and Appellant and Green, parked on the street in front of his house, left after McKnight told them to come back for her in about forty-five minutes. Appellant and Green did not return and McKnight eventually had her brother-in-law pick her up between 7:00 and 7:30 p.m. She last saw Witherspoon alive when she left his house that evening.[2]

Green testified he and Appellant returned to Witherspoon's house at approximately 9:30 p.m. and learned that McKnight had left. They stayed about fifteen minutes and then went to Faye Smith's house, about ten minutes away. Smith was not home but her eleven and twelve year old daughters were. Green and Appellant arrived there shortly before 10:00 and Appellant left shortly after

1. Witherspoon was an alcoholic and had not had a drink for over twenty-seven years. Apparently, in the weeks preceding his death, Cindy Terrell, also an alcoholic, induced Witherspoon to once again imbibe. Marvin Terrell often found the two drunk together, and was called once to bail Witherspoon out of jail after he was involved in a one-vehicle, alcohol-related accident. Witherspoon promised Terrell he would never again drive while under the influence. The implication was, given Witherspoon's previous refusal to loan his truck to anyone, that he was intoxicated and would not drive himself to the liquor store, preferring to loan the vehicle to McKnight so she could purchase the liquor for him.

2. McKnight testified that Witherspoon loaned her approximately $100 dollars over the two-day period she met with him. She also testified that before she left his house, Witherspoon, who had apparently had quite a bit to drink, asked her to take his phone off of the hook because he didn't want to be disturbed. When she left Witherspoon's house that night, he had in his possession his wallet (which contained an unspecified amount of cash), a police-type flashlight and a Radio Shack combination stereo/television, all of which were missing when his body was discovered. She also told Appellant Witherspoon had given her money, and even gave Appellant about $25 of the cash she had received.

arriving, sometime between 10:10 and 10:20 p.m. However, prior to leaving the Smith house, Appellant told Green that he needed to "go knock somebody in the head and get him some money" and invited Green to come along. Green refused, and stayed with the girls, leaving sometime after midnight. Appellant promised to return for Green, but never did.

Elmer and Barbara Dawson lived down the road from Witherspoon and testified on the night of September 3 they drove by Appellant's house at about 8:30 or 9:00 p.m. and saw him standing in the front yard speaking to two men. They were unable to say if the men were black or white, and Elmer testified that he only saw one man. Both agreed that they saw a light colored Cadillac parked in the street in front of Witherspoon's house. The couple was returning from school shopping with their children that evening.

Meanwhile, McKnight called Green at Smith's house and spoke with him about Witherspoon. She asked him what condition Witherspoon was in when he and Appellant left him, and expressed concern that she had not been able to reach him.[3]

Sometime between 10:30 and 11:00 p.m. on the evening of the 3rd, Appellant approached Josephus Huntley and Charles Duffy at the Hide Out Club in Jones, offering to sell them the t.v./stereo from Witherspoon's house and his shotgun. Huntley claims he never saw the gun, but did agree to purchase the t.v./stereo for fifty dollars and did so after borrowing the money from Duffy. Duffy saw both the t.v. and the gun.

McKnight continued to phone Witherspoon several more times that night, and the next morning had a friend drive her over to Witherspoon's house. When she arrived, she noticed that the door was open, and upon seeing overturned furniture and blood, and getting no response after calling out Witherspoon's name, left. She returned to the house later after being advised by her sister to return and remove her fingerprints, but did not go inside.

Cindy Terrell last saw Witherspoon alive on the afternoon of September 3, and became concerned when she was unable to contact him by phone the next day. Since she had classes to attend that night, she asked her husband Marvin to try to contact Witherspoon. When Marvin was unable to contact Witherspoon, he went over to the house to check on him. Upon entering the house, he discovered the body and called police. He also noted that the t.v./stereo, flashlight and Witherspoon's prized shotgun were missing from the house.

Forensic analysis of the evidence present in the house and on the t.v./stereo revealed nothing connecting Appellant with the crime. There were no identifiable fingerprints, and hair and blood samples taken from the home could not be matched to him. However, testimony indicated the police simply gave up trying to collect hair samples because the house was unkempt and had not been cleaned for a long period of time, making the retrieval of hair samples useless. The only print found was on the t.v./stereo. That print was suitable for identification, but was not matched to anyone, including the Appellant, the victim, the Terrells, McKnight or Green (all of whom admitted being in the house at one time or another prior to the murder).

It is obvious from the record that the sequence of events, upon believing any one witnesses' testimony as to the time of occurrence for any particular event in the chain, becomes distorted. Throughout the testimony, it is repeatedly stressed that the time estimates given are simply that—estimates and approximations. It should also be noted that of those testifying, several admitted drinking during the evening, several were convicted felons (some serving time at the time of trial), and several admitted that the time descriptions were at best approximations as they really never kept track of the time for any reason, much less in anticipation of testifying at a murder trial.

Appellant's arguments and propositions of error will be addressed in the sequential

---

**3.** Green testified that Witherspoon put his boots on and walked him and Appellant out to the car as they left. He also testified to seeing the t.v./stereo and flashlight at Witherspoon's house during the time he and Appellant were there.

order of the trial, beginning with the first stage proceedings. Appellant's supplemental Propositions I through IV will be incorporated into the original brief, renumbered XXIV, XXV, XXVI and XXVII, and dealt with sequentially.

## PRE–TRIAL PROCEEDINGS

Appellant claims (Propositions XI and XXVI) it was error for the district judge to reverse the magistrate's ruling dismissing the original information. Appellant's initial preliminary hearing was held October 24 and 30 and November 3, 1986, at which time Magistrate Niles Jackson sustained the defense demurrer to the State's evidence, and dismissed the charges. The State appealed pursuant to *Rules of the Court of Criminal Appeals*, 22 O.S.Supp.1987, Ch. 18, App.Rule 6.1, and District Judge James Blevins, applying the guide-lines specified by this Court in *Fletcher v. State*, 735 P.2d 1190 (Okl.Cr. 1986), *overruled, State v. Rhine*, 773 P.2d 762, 763 (Okl.Cr.1989), sustained the demurrer, finding, after reviewing the magistrate's ruling for errors of law only, that he could not review issues of fact to determine whether probable cause existed. The State, pursuant to Rule 6.1 (codified at 22 O.S.Supp.1987, §§ 1089.1–1089.7), appealed Judge Blevins' ruling.

Appellant's argument concerning *ex post facto* application of 22 O.S.Supp.1987, § 1089.5 to his case was dealt with in this Court's order entered September 28, 1989, denying Appellant's Petition for Rehearing of our original ruling wherein we reversed and remanded for rehearing the decision granting Appellant's demurrer to the evidence. We will not revisit that issue here. We also found that Judge Blevins had misinterpreted our decision in *Fletcher, supra*, requiring a new Rule 6.1 hearing in the case.

■ After reviewing the record in this case, we do not find that the reversal of the magistrate's ruling was erroneous, nor was it error, as Appellant claims, for the district court to review the facts presented in the preliminary hearing in reaching its determination. We will not vacate Appellant's conviction and sentence or remand to the district court for dismissal.

## FIRST STAGE PROCEEDINGS

Appellant claims fundamental error at Proposition XXVII, alleging the trial court failed to admonish the venirepersons following an improper colloquy between a venireman and the District Attorney. The complaint alleges that the question asked by the juror intimated Appellant was guilty of the crime, requiring his removal as a juror by either trial counsel or the trial court. Failure to remove the juror, he claims now, was fundamental error and ineffective assistance of counsel.

■ A review of the record does not support Appellant's contention. The question asked by Juror Dozier was directed at the State's delay in bringing Appellant to trial when the crime had occurred four years earlier. When initially seated, Dozier was asked by the trial court if selected as a juror would he presume the Appellant innocent until proven guilty beyond a reasonable doubt, to which he responded in the affirmative. The question posed to the State was as follows:

> **Juror Dozier:** Why—as I understand, this fellow committed the crime four years ago?
>
> **State:** Right.
>
> **Dozier:** That's been in my mind. Why did you wait so long to bring him to trial?

While Dozier's question may have been inartfully worded, a reading of the transcript indicates his concern was with the State's delay in bringing Appellant to trial, not a comment on Appellant's guilt or innocence.

Contrary to Appellant's assertions, each venireperson, prior to and following Dozier, was asked by the trial court if they would presume Appellant innocent until proven guilty beyond a reasonable doubt. All answered affirmatively. The jury was repeatedly reminded at various points during the trial of the presumption of innocence.

■ Appellant made no objection to Dozier's question, did not request Dozier's removal, and waived his ninth peremptory challenge. Nothing in the record indicates Dozier had preconceived notions of Appellant's guilt, or that his presence skewed the jury

deliberations. There was no error in Dozier's presence on the panel and any potential error was waived by Appellant's failure to object and to strike him from the jury. Failure to exercise all peremptory challenges waives objections as to potential bias of jurors. *Douma v. State,* 749 P.2d 1163, 1166 (Okl.Cr.1988); *Stott v. State,* 538 P.2d 1061, 1065 (Okl.Cr.1971); *Young v. State,* 357 P.2d 562, 566 (Okl.Cr.1960); *Ross v. Oklahoma,* 487 U.S. 81, 89–91, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80, 91 (1988).

We also find no admonishment was necessary in light of the extensive jury questioning and instructions given on the presumption of innocence. There is no error here.

■ Appellant next claims at Proposition IV that the prosecutor defined reasonable doubt for the jury during voir dire. The general rule of this Court is that when the State makes an objectionable statement, it is incumbent upon defense counsel to make a timely, contemporaneous objection. Failure to object waives all but plain error on appeal. *Fox v. City of Tulsa,* 806 P.2d 79, 80 (Okl.Cr. 1991); *Shelton v. State,* 793 P.2d 866, 871 (Okl.Cr.1990); *Jones v. State,* 764 P.2d 914, 917 (Okl.Cr.1988); *Thomason v. State,* 763 P.2d 1182, 1183 (Okl.Cr.1988); *Smith v. State,* 737 P.2d 1206, 1213 (Okl.Cr.1987), *cert. denied,* 484 U.S. 959 108 S.Ct. 358, 98 L.Ed.2d 383 (1987); *Plunkett v. State,* 719 P.2d 834, 842 (Okl.Cr.), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 675, 93 L.Ed.2d 725 (1986); *Tucker v. State,* 620 P.2d 1314, 1317 (Okl.Cr. 1980). No objection was made here. Regardless, a review of the record reveals that the prosecutor's question to a potential juror affirming that the jury would not make the State's burden greater than "beyond a reasonable doubt" did not rise to the level of defining reasonable doubt. As we have previously stated, it is not grossly incorrect for the prosecutor to state that "beyond a reasonable doubt" does not mean "beyond a shadow of a doubt." *Nguyen v. State,* 769 P.2d 167, 171 (Okl.Cr.1988), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989), *overruled on other grounds; Green v. State,* 862 P.2d 1271 (Okl.Cr.1993); *Diaz v. State,* 728 P.2d 503, 511 (Okl.Cr.1986). There is no error here.

Appellant argues at Proposition I there was insufficient evidence to support his conviction, summarized simply by stating that he could not have committed the crime if the time approximations of certain of the witnesses are to be believed. He alleges that all of the evidence presented was circumstantial, and therefore insufficient to support a conviction.

■ When evaluating a sufficiency of the evidence claim involving only circumstantial evidence, this Court will examine the evidence, in the light most favorable to the State, to determine, not whether the evidence excludes every possibility other than guilt, but to determine whether other reasonable hypotheses are excluded. *Banks v. State,* 728 P.2d 497, 501 (Okl.Cr.1986). In *Greer v. State,* 763 P.2d 106, 107 (Okl.Cr. 1988), we held:

> It is our opinion that the "reasonable hypothesis" test is the better standard when reviewing a verdict based solely upon circumstantial evidence.... This test requires only that the State's evidence exclude every reasonable hypothesis other than guilt.

When considering circumstantial evidence, a jury may consider both the evidence and inferences reasonably deduced therefrom. *See Morrison v. State,* 792 P.2d 1189, 1193 (Okl.Cr.1990); *Nguyen v. State,* 769 P.2d 167 (Okl.Cr.1988), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989); *Johnson v. State,* 764 P.2d 530, 532 (Okl.Cr.1988); *Dodson v. State,* 674 P.2d 57, 58 (Okl.Cr. 1984). Insofar as Appellant has challenged the sufficiency of the evidence, we will undertake our review of the facts underlying this conviction mindful of this standard of review.

■ While the evidence presented here was circumstantial, Appellant's conviction still does not warrant reversal. The implication from Appellant's contention is that circumstantial evidence somehow is less probative than direct evidence and/or testimony. That is simply not the case. *Woodruff v. State,* 846 P.2d 1124, 1133 (Okl.Cr.), *cert. denied,* —— U.S. ——, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993). The distinction to be made is that direct evidence/testimony re-

quires no inference to be made: the particular piece of evidence or testimony is the proof. Circumstantial evidence requires that a reasonable inference be drawn, which must then be found to be inconsistent with any reasonable hypothesis other than the defendant's guilt. *Woodruff*, 846 P.2d at 1133; *Greer v. State*, 763 P.2d 106, 107 (Okl.Cr. 1988); *Smith v. State*, 695 P.2d 1360, 1362 (Okl.Cr.1985), *overruled on other grounds, Kaulaity v. State*, 859 P.2d 521 (Okl.Cr.1993). There is no mixture or combination of the two. Evidence is either direct or it is circumstantial, and the two are clearly distinguishable.

■ Appellant made several statements to the police, initially claiming that he did not know the victim. When confronted with the possibility that his fingerprints [4] had been found at the scene, his story abruptly changed, and he stated that he had been to Witherspoon's house on one occasion to discuss breeding dogs. He also volunteered that his fingerprints appeared in numerous locations throughout the house because he had been in various rooms in Witherspoon's residence during his brief visit. Appellant admitted he had possession of Witherspoon's t.v./stereo and shotgun, which he sold, immediately after Witherspoon's death (although he claimed Green had given him the items), and that he had been to Witherspoon's house earlier that same evening. Testimony from Green indicated Witherspoon was alive and unharmed at the time Green and Appellant left the house sometime after 8:30 p.m.; around 10:00 p.m. Appellant stated to Green that he was going to "knock someone in the head and take their money" and invited Green to accompany him; Appellant sold Witherspoon's belongings at the Hide Out Club less than an hour after he invited Green to assist him; there was blood on Appellant's ignition key and trunk lid [5]; medical testimo-

ny placed Witherspoon's death at approximately 10:30 p.m.; and Appellant's presence was unaccounted for during the time of the murder.[6] There was more than sufficient evidence to support the jury's verdict. Despite the fact that the evidence presented was circumstantial, it was strong circumstantial evidence, sufficient to uphold Appellant's conviction.

■ Proposition VI claims that Appellant was denied his right to due process and a fair trial because of the prosecutors' inappropriate behavior during trial. It should be noted that only one of the alleged improper comments was objected to during trial. As such, we will review the remaining comments for plain error only. *See, Fox, supra; Shelton, supra; Thomason, supra; Smith, supra; Plunkett, supra; Tucker, supra; Jones, supra.* We will also address Proposition XXIV here as Appellant claims error occurred when a witness testified that Appellant had previously been in prison. We have reviewed the entire record, and do not find reversible error here.

■ Appellant complains of several statements during voir dire which he identifies as prejudicial. The first encompasses a discourse by the State which Appellant objected to as being opening argument. A bench conference was held, and the prosecutor agreed to refrain from further comment. No additional action was requested by Appellant, and the voir dire proceeded. It is incumbent upon counsel when objecting to request relief from the trial court as he or she deems appropriate for the situation. Counsel here requested no admonition or instruction to the jury which would have cured any error with regard to the inappropriate comments. *Thomas v. State*, 811 P.2d 1337, 1342–43 (Okl.Cr.1991), *cert. denied*, 502 U.S. 1041, 112 S.Ct. 895, 116 L.Ed.2d 798 (1992); *Cosgrove*

---

**4.** . The police had not found any fingerprints at the scene, much less Appellant's.

**5.** The t.v./stereo and shotgun were in Appellant's trunk when he sold them at the Hide Out Club.

**6.** Appellant's statements ·to the police are not direct evidence of anything other than that he was at Witherspoon's house, at some point in time, and he had possession of Witherspoon's

belongings. The inference to be made is that Appellant committed the murder and Witherspoon was the victim. Likewise, Appellant's statement to Green that he was going to "knock somebody in the head" is not direct evidence that he killed Witherspoon. Once again, the trier of fact must infer that Appellant acted on the statement, and killed Witherspoon. None of the statements, even if true, are direct evidence that Appellant killed Witherspoon.

*v. State,* 806 P.2d 75 (Okl.Cr.1991). There is no requirement that the Court reverse a conviction where the trial judge properly sustains an objection by "the defendant, and we do not reverse on this assignment." *Shepard v. State,* 756 P.2d 597, 600 (Okl.Cr.1988).

The remaining voir dire comments complained of were either proper questions for ascertaining the acceptability of potential jurors or were proper comment on the State's role in the trial. There was no attempt by the State to align itself with the jurors. Appellant's cited authorities present factual situations dissimilar from those in the present case. Here the prosecutor simply stated he represented the people of Oklahoma County.

Appellant next alleges it was error for the prosecutor to display the t.v./stereo, shotgun, and a flashlight similar to the one in Witherspoon's home (the alleged murder weapon) during opening statements. The State's cited authority here, alleging it is proper to handle evidence during trial [7] is inapplicable, insofar as the items in question had not yet been admitted as evidence. While we find it was improper for the items to have been displayed to the jury during opening statement, we do not find Appellant was prejudiced by the display. Appellant did not object to the display during the State's opening, waiving all but plain error. Ultimately, the television and shotgun were admitted, with no objection from Appellant. Likewise, the flashlight was used throughout trial, described as being similar to the one owned by the victim, and touted as the possible murder weapon. Appellant never objected to the display, nor can he show now how the use of the flashlight resulted in prejudice sufficient to warrant reversal. The prosecutor's comments describing Appellant's sale of a "very bloody" television provided an accurate description of the t.v. immediately after the crime, although the t.v. was not in that condition when sold.[8] Regardless, the comment was not so improper that it constituted error, and while inartfully worded we cannot say it was phrased to mislead the jury.

Appellant then claims error through the admission of police testimony describing the stench of blood. While the testimony concerning the smell of blood was improper we cannot say that it was prejudicial error. The trial was replete with testimony concerning the excessive amount of blood present at the scene due to the victim's severe head wounds, and the officer's testimony was cumulative of the testimony reflecting the extent of those injuries. However, we do not find that the referenced testimony amounted to "gratuitous gore," nor do we find it prejudiced Appellant so as to require reversal.

Appellant also alleged error occurred during the questioning of Mary McKnight. Appellant's motion in limine was granted, preventing the State from eliciting testimony from witnesses concerning Appellant's prior convictions and incarcerations during the first stage of trial. During McKnight's questioning, she was asked how she first came to know Appellant, and the following exchange was had:

**State:** All right. Did you have any other relatives that were friends of Cheatham?

**McKnight:** Yes, sir.

**State:** Who was that?

**McKnight:** Well, my whole family. My brother and Cheatham was down—I first met him down in the penitentiary together.

**Defense Counsel:** May I approach, Your Honor?

(Bench conference out of the hearing of jury.)

**Defense:** Well, Judge, I could have sworn we had a motion in limine concerning this, cautioning their witnesses about the penitentiary, DOC custody....

**State:** I specifically instructed this witness not to talk about things like this....

**Court:** All right, let's proceed. You had better remind this witness....

(Pause in proceedings for Counsel to talk to witness.)

---

7. *Grant v. State,* 703 P.2d 943 (Okl.Cr.1985).

8. Huntley purchased the t.v. from Appellant and testified it did not have any blood on it. Expert testimony indicated an orthotolidine test performed on the television showed it had been wiped clean of blood.

Appellant requested no jury admonition, nor did he request a mistrial. McKnight was admonished (outside of the hearing of the jury) and the questioning continued.

■ While Appellant did not state the word "objection" when voicing his displeasure with McKnight's answer, from the exchange following the response we would be remiss in saying that there was no objection, as the State suggests. Likewise, a review of the entire exchange reveals that the State was surprised by the answer received, especially since it had admonished the witness not to speak of Appellant's prior convictions[9], and we do not find that the comment was intentionally elicited. However, while we do not condone the remark, which was error, we cannot say that it is cause for reversal.

■ We have long held that when inadmissible evidence or an improper comment is presented to a jury, an admonishment to the jury by the court that the evidence or comment is not to be considered will cure any error. *Thomas v. State,* 811 P.2d at 1342–43; *Cosgrove v. State,* 806 P.2d 75 (Okl.Cr.1991); *Patterson v. State,* 735 P.2d 338, 341 (Okl.Cr. 1987); *Funkhouser v. State,* 734 P.2d 815 (Okl.Cr.1987), *cert. denied,* 484 U.S. 942, 108 S.Ct. 326, 98 L.Ed.2d 354 (1987); *Kitchens v. State,* 513 P.2d 1300 (Okl.Cr.1973). We find this case similar to *Thomas,* where counsel objected, but requested no admonishment, and then claimed prejudice on appeal. We refused to find error, stating:

> Such an admonishment in the present case would have been appropriate, but none was requested. Appellant now requests us to reverse his conviction regardless of the fact that the error could have been cured at trial. We are loath to reach such a result which could have been easily avoided.... First, as we stated in *Shepard,* when the trial court sustained the objection, the desired result was obtained. Second, Appellant's failure to request admonition of the jury after the witness ignored

requests to stop is in the nature of invited error.

*Thomas,* 811 P.2d at 1342–43.

■ At the time he objected, Appellant could have requested a jury admonition, curing any potential error. He chose not to do so. We will not second guess trial counsel's strategy in not requesting an admonition, but neither will we allow Appellant to now claim reversible error where he invited the error by failing to make the request.

■ Appellant then claims error during closing argument, referencing several of the State's comments. Once again, Appellant did not object during closing to any of the comments he now claims were erroneous and prejudicial. A review for plain error finds none. Allegations of prosecutorial misconduct should not cause a reversal of judgment or modification of sentence unless their cumulative effect is such as to deprive the defendant of a fair trial and fair sentencing proceeding. *See Pickens v. State,* 850 P.2d 328, 343 (Okl.Cr.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994); *Williams v. State,* 658 P.2d 499, 501 (Okl.Cr. 1983). We find that the Appellant's claims do not warrant reversal.

■ The first comment alleged as error requested that the jurors remember their potential to be crime victims and how fragile life is and that it can be unexpectedly taken away. We do not find that the comment rises to the level of error sufficient to deprive Appellant of a fair trial. While ill-advised, the statements are not sufficient to constitute reversible error.

■ The State referenced the "blood splattered on the walls from the force of the blows to this poor, defenseless, inebriated old man." We have long held that counsel for both the defendant and the State must be accorded a liberal freedom to argue the evidence and its logical inferences during closing arguments. *Jones v. State,* 738 P.2d 525, 530 (Okl.Cr.1987); *Lewis v. State,* 732 P.2d 1 (Okl.Cr.1987). We have examined the statements identified by Appellant as objectiona-

---

**9.** McKnight's answer was clearly not responsive to the question, as the State asked which of McKnight's other relatives were Cheatham's friends, not where she had become acquainted with him.

**426**

ble, and do not find that reversible error occurred. The comment was a reasonable inference drawn from the evidence presented at trial: Witherspoon was an elderly man, inebriated and unable to defend himself when he became the victim of a savage, bloody beating. We find no error here.

■ The State related a story concerning a "crafty lawyer" who promised the jury that the "real killer" would come through the courtroom door at a specified time, causing the jury to look toward the door at the designated time. Upon noting that the jurors looked, the lawyer equated their actions with "reasonable doubt," and was surprised when the jury came back with a guilty verdict. Questioning the foreman after the trial, the lawyer wanted to know why the verdict was guilty and was told that the foreman was watching the defendant at the designated time, and the defendant was the only person in the courtroom who did not look toward the door because he knew he had committed the crime. The analogy used by the State in relating the story was that things are not always as they seem; that there were weaknesses in the State's case; that the jury should not be misled because the State presented a case that was largely circumstantial; and that, despite its weaknesses, the State decided to proceed with the prosecution. Appellant claims the telling of the story somehow cast aspersions upon defense counsel's abilities and trustworthiness. That was not the case.

The State knew from the beginning and said so that they were not going to be able to fill in all of the gaps for the jury: there were time discrepancies; there was no murder weapon; there were no tell-tale fingerprints; there were no eyewitnesses. All of these things made proving its case more difficult, but not impossible. The State's tact throughout was to remind the jury that they could find Appellant guilty where the proof consisted mainly of circumstantial evidence, which they did. The comment is not cause for reversal, but rather constituted persuasive argument coupled with admissions of weakness in the State's case, and proof, albeit circumstantial, of Appellant's involvement in the crime as charged. We find no error here.

■ We have held that in order for the remarks of the prosecuting attorney to constitute reversible error they must be flagrant and of such a nature as to be prejudicial to the defendant. *Romano v. State,* 847 P.2d 368, 380 (Okl.Cr.1993), *aff'd,* 512 U.S. ──, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994); *Collins v. State,* 758 P.2d 340, 341 (Okl.Cr. 1988); *Wimberli v. State,* 536 P.2d 945, 952 (Okl.Cr.1975). The prosecutor compared Appellant's actions to those of Pontius Pilate, remarking that, like Pilate, Appellant could not wash Witherspoon's blood from his hands. Appellant claims the analogy was a comment on his inability to be rehabilitated, prejudiced the jury and invoked sympathy for the victim. While the comment may have been ill-advised, we do not find it to be reversible error as we cannot say that this statement resulted in Appellant's being deprived of a fair trial and/or sentencing. When determining whether a prosecutor's closing remarks were outside the record and so prejudicial as to warrant a reversal, the error is to be considered in light of the evidence and whether the remarks can be said to have influenced the verdict against the appellant. *Pickens v. State,* 850 P.2d at 343; *Keeling v. State,* 810 P.2d 1298, 1303 (Okl.Cr.1991); *Thornton v. State,* 668 P.2d 344, 346 (Okl.Cr.1983). We find that there was more than sufficient evidence to support Appellant's conviction and cannot say that the closing remarks resulted in that conviction.

Appellant claims at Proposition VII that he was denied his constitutional right to testify when the trial court ruled that his prior criminal history could be used to impeach him in the event he chose to testify. Appellant sought a motion in limine, which was denied by the trial court, wherein the State would only be allowed to elicit the number of previous convictions in questioning Appellant had he chosen to testify, not the specifics of each of the prior felonies. That motion was denied, the trial court finding, after hearing extensive argument, "in this particular matter that the probative value well outweighs

the prejudicial value toward this defendant." Appellant did not testify at trial.

■ Appellant urges since his prior crimes were violent (shooting with intent to kill, carrying a concealed weapon after former conviction of a felony, first degree manslaughter, and assault and battery with a dangerous weapon) they had no bearing on his truth and veracity, and therefore had no impeachment value. He claims since the case against him was largely circumstantial, he needed to testify, but could not in light of the trial court's ruling. That ruling, he alleges, was fundamental error.

■ We have repeatedly held that a motion in limine is merely advisory. In order to properly preserve objections to the introduction of evidence which is the subject of the motion in limine, objection must be made at the time the evidence is sought to be introduced. *Cline v. State,* 782 P.2d 399, 400 (Okl.Cr.1989); *Nealy v. State,* 636 P.2d 378 (Okl.Cr.1981); *Teegarden v. State,* 563 P.2d 660 (Okl.Cr.1977). The only time the ruling can be contested is after the appellant has taken the stand and there has been an objection to questions concerning his prior criminal conduct. Appellant's decision to remain silent was a tactical choice which precludes this Court from considering the issue.

Regardless, felony convictions are admissible for impeachment under 12 O.S.1981, § 2609(A)(2) if two conditions are satisfied: (1) the conviction or the release of the witness from confinement is less than ten (10) years prior to the time at which admission of that conviction is sought, and (2) the trial court determines that the probative value of the evidence outweighs its prejudicial effect to the detriment of the defendant. *Cline v. State,* 782 P.2d at 400. Even applying the strictest interpretation of the ten-year-rule, all but one of the convictions would have been admissible in light of the court's finding that the probative value of the evidence outweighed its prejudicial effect. We find no error here.

At Proposition VIII, Appellant alleges the trial court failed to rule on his motion to suppress, resulting in error. Appellant's mo-

tion sought to preclude the use of his statement to police.[10] Upon bringing the motion to the trial court's attention, the court decided to hear and rule on the motion after seating the jury. The motion was never raised again, nor was the introduction of the statement objected to at trial.

■ When a defendant timely files a motion to suppress but fails to renew the issue by objecting to its introduction at trial, he waives his right to complain to this Court. *Jones v. State,* 742 P.2d 1152, 1154 (Okl.Cr. 1987); *Wing v. State,* 579 P.2d 196, 198 (Okl. Cr.1978). Since an assignment of error has not been properly preserved, this Court's review is limited to plain error only. *Cole v. State,* 766 P.2d 358 (Okl.Cr.1988). Appellant has waived his right to complain, and our review for plain error reveals none.

■ Evidence at trial revealed Appellant appeared at the police station voluntarily; he was given *Miranda* warnings; he spoke to police, never requesting that the questioning cease or invoking his right to counsel; and Appellant repeatedly denied any knowledge of or participation in the crimes. We find no error here.

■ Proposition IX alleges error in allowing the introduction of the victim's bloody bedding, shirt and undershirt. Not only did Appellant not object to the admission of this evidence, he stipulated to it. Appellant has waived all but plain error because he did not object to the admission of this evidence at trial. *Elix v. State,* 743 P.2d 669, 672 (Okl. Cr.1987); *Johnson v. State,* 611 P.2d 1137 (Okl.Cr.1980), *cert. denied,* 449 U.S. 1132, 101 S.Ct. 955, 67 L.Ed.2d 120 (1981); *Castleberry v. State,* 522 P.2d 257 (Okl.Cr.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974).

■ This Court has long held that the admission of evidence at trial is within the discretion of the trial judge, and this Court will not find reversible error except where that discretion has been abused. *Hughes v. State,* 815 P.2d 182, 185 (Okl.Cr.1991); *Behrens v. State,* 699 P.2d 156 (Okl.Cr.1985). An examination of the record reveals no abuse of

10. Appellant never confessed to the crimes, although he did give a statement to police.

discretion in the admission of the evidence, especially in light of Appellant's stipulation. The clothing and bedding were used to support the State's claim that Witherspoon was conscious after the attack, which was initiated in the living room, after which he made his way to the bedroom, undressed and lay down on the bed where he subsequently died. Appellant's claim of prejudice from the stench of blood from the clothing was addressed above at Proposition VI. We find no error here.

At Proposition X, Appellant claims he was denied effective assistance of counsel, basing the claim upon his previous propositions of error alleging prosecutorial misconduct, admission of his statement, introduction of the bedding and clothing, and failure to request the life without parole sentencing option.

■■■ Claims of ineffective assistance of counsel are judged in light of the Supreme Court's guidelines established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We considered the application of the test in *Pierce v. State*, 786 P.2d 1255, 1266–67 (Okl.Cr.1990), and found:

> We have long held that allegations of incompetent counsel will be judged by "whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance." *Fisher v. State*, 736 P.2d 1003, 1011 (Okl.Cr.1987); *Cotton v. State*, 679 P.2d 1305, 1308 (Okl.Cr.1984). In review of such a claim, we are to accord a strong presumption that counsel was at least constitutionally competent. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We will not make this judgment in hindsight, second guessing counsel's trial strategy. *Dutton v. State*, 674 P.2d 1134 (Okl.Cr. 1984).

In *Dutton v. State*, 674 P.2d 1134, 1139 (Okl. Cr.1984), we held:

> A criminal defendant should receive reasonably competent assistance of counsel. *Johnson v. State*, 620 P.2d 1311 (Okl.Cr. 1980). However, this does not mandate flawless counsel or counsel judged ineffective by hindsight. *Clark v. Blackburn*, 619

F.2d 431 (5th Cir.1980). *See also Johnson*, 620 P.2d at 1313.

With these tenets in mind, we have reviewed the argument raised by Appellant and, having examined the record before us, cannot say that the representation afforded Appellant during the proceedings fell below the standard established in *Strickland, supra*. The determining criteria is whether, but for counsel's alleged omissions or commissions, the result of the trial would have been different. We do not find that criteria present here.

■■ A review of the record reveals that counsel engaged in rigorous examination and cross-examination of jurors and witnesses, filed several pre-trial motions resulting in the exclusion of evidence and statements that would have been very beneficial to the State's case, argued vigorously in support of Appellant's claim that he was not responsible for the crime, and that the case presented by the State consisted mainly of circumstantial evidence. The fact that Appellant was convicted does not mean that his counsel was ineffective, and we find no evidence to support that claim in this record.

■■ At Proposition V, Appellant then complains it was fundamental error for the trial court to fail to define the term "reasonable doubt" for the jury. As acknowledged by Appellant, it is well settled that the term "reasonable doubt" is self-explanatory and is not to be defined in jury instructions. *Underwood v. State*, 659 P.2d 948 (Okl.Cr.1983). We find no reason to change our position on this matter.

Given Appellant's statement to the police, the nature of the crimes, and the evidence of his guilt, Appellant has failed to demonstrate, absent the errors he claims occurred, that the jury would have returned a different verdict.

## SECOND STAGE PROCEEDINGS

■■ We need only address one of the allegations made concerning errors occurring in the second stage of the proceedings because that error requires that the case be remanded to the trial court for resentencing. Appellant alleges that his rights to due pro-

cess and equal protection were violated when the trial court failed to instruct the jury with respect to the potential punishment alternative, life without parole, even though no such instruction was requested. He bases his claim on the fact that this punishment option, codified at 21 O.S.Supp.1987, § 701.10, became law prior to his trial, although subsequent to the commission of the offenses. We find merit in the argument.

Due to the extreme nature of the penalty involved in capital murder cases, we have often discussed the need for extremely careful scrutiny of the imposition of the death sentence. *See Liles v. State*, 702 P.2d 1025, 1036 (Okl.Cr.), *cert. denied*, 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986). This philosophy is also demonstrated by the legislative requirement that this Court examine each and every sentence of death for any evidence that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and whether the evidence offered at trial supports each of the jury's findings with respect to the aggravating circumstances which support the sentence. 21 O.S.Supp.1987, § 701.13(C). In short, sentences of death must be absolutely, unquestionably fair.

Given the gravity of the death penalty, we find that principals of fundamental fairness compel us to reverse this case for a new second stage trial. As discussed in *Allen v. State*, 821 P.2d 371 (Okl.Cr.1991), we find no constitutional prohibition to the application of this possible sentencing option in cases where the penalty became law in the period while the offender awaited trial. Quite simply, we cannot justify a decision which would act as a total bar to consideration of a punishment alternative to death merely because the crime giving rise to the trial occurred a short time before the effective date of previously enacted legislation.

The circumstances involved in this decision are unique and should not be interpreted to have any broader ramifications outside the very limited situation implicated under these facts. We will apply this analysis only in cases where the amendment adding the option of life without parole to Section 701.10 was in effect at the time of the trial. Only those cases will receive consideration of the additional sentencing possibility. In the interests of fundamental fairness, we find that justice demands the action taken by this Court under these distinctively compelling facts.

At Proposition III, Appellant argues that he is entitled to have his sentence reversed and remanded, notwithstanding the Oklahoma Legislature's enactment of 21 O.S.Supp.1993, § 701.10a, which restricts sentencing options in capital cases to "any sentence **authorized by law at the time of the commission of the crime** . . . ." While this is the first time this issue has been raised by an Appellant, it is not the first time this issue has been addressed by this Court. In *Fontenot v. State*, 881 P.2d 69 (Okl.Cr. 1994), this same issue was addressed in footnote 2, in response to Judge Lumpkin's dissenting opinion, where we noted:

> The Oklahoma Legislature enacted the "life without the possibility of parole" option in November of 1987. *See* 21 O.S.Supp.1987, Secs. 701.9 and 701.10. Although Fontenot committed the offenses at issue prior to this date, his second trial and conviction did not occur until June of 1988—well after the statute's enactment. Under these circumstances, this Court's recent opinions in *Salazar v. State*, 852 P.2d 729 (Okl.Cr.1993) and *Hain v. State*, 852 P.2d 744 (Okl.Cr.1993), require that Fontenot's case be remanded for a new sentencing proceeding providing him with the life without parole punishment option. We note that Fontenot did not request an instruction on life without parole. As we stated in *Salazar*, however, the error resulting from instructions which fail to provide the proper range of punishment is fundamental and cannot be waived.

> The dissent argues that the Legislature has effectively precluded this Court from applying the *Hain* and *Salazar* holdings to Fontenot's case. Shortly after those opinions were handed down, the Legislature amended the statute setting forth the procedures to be followed when this Court remands a capital case for resentencing. Upon remand, the sentencer may now impose "any sentence authorized by law at

the time of the commission of the crime...." 21 O.S.Supp.1993, Sec. 701.10a (emphasis added). The dissent claims this amendment, which was expressly made retroactive, prohibits this Court from granting relief under *Salazar* and *Hain* to all defendants whose cases are handed down after its enactment.

The Legislature did not, however, amend 21 O.S.Supp.1987, Sec. 701.9, which clearly provides that the punishment for first degree murder shall be life, life without parole or death, and that these punishment options are effective upon "conviction." Fontenot was convicted after this provision was enacted, and was thus entitled to have his jury instructed on the life without parole sentencing option. *See Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). The trial court erred in failing sua sponte to instruct Fontenot's jury in accordance with section 701.9. The Legislature's procedural amendments to the remand provisions in section 701.10a did not obviate the trial court's section 701.9 sentencing error.

Moreover, we rejected a similar argument raised by the State in its Petition for Rehearing in *Salazar v. State*, 859 P.2d 517 (Okl.Cr.1993) (order denying petition for rehearing). In response to the State's claim that the amended section 701.10a warranted rehearing in Salazar's case, we stated as follows: "To apply [section 701.10a] to Salazar would deprive him of a sentencing option that this Court has stated was available to him in *Wade v. State*, 825 P.2d 1357 (Okl.Cr.1992); and *Allen v. State*, 821 P.2d 371, 376 (Okl.Cr.1991), and would result in harsher penalty options, which would violate the prohibition against imposing a harsher punishment in an ex post facto manner." (Citations omitted). *Fontenot*, 881 P.2d at 74 n. 2. Appellant is entitled to have his jury instructed on the life without parole option, notwithstanding 21 O.S.Supp.1993, § 701.10a.

Having reviewed the allegations of error raised by Appellant, we find that the conviction for felony murder is **AFFIRMED**. The death sentence returned for the felony murder conviction is **VACATED** and the case is **REMANDED** for new second stage proceedings.

JOHNSON, P.J., and CHAPEL, V.P.J., concur.

LUMPKIN, J., concurs in part/dissents in part.

STRUBHAR, J., concurs in result.

LUMPKIN, Judge, concurring in part and dissenting in part:

While I agree Appellant's judgment should be affirmed, I must again respectfully disagree with my colleagues this case must be remanded for resentencing. I do this based on my dissents in *Humphrey v. State*, 864 P.2d 343, 345 (Okl.Cr.1993); *Hain v. State*, 852 P.2d 744, 753 (Okl.Cr.1993); and *Salazar v. State*, 852 P.2d 729, 741 (Okl.Cr.1993). I also dissent because I believe my colleagues' reasoning is based on an erroneous interpretation of the Eighth Amendment to the United States Constitution. *See Salazar v. State*, 859 P.2d 517, 519 (Okl.Cr.1993) (Lumpkin, P.J., dissenting to Order Denying Petition for Rehearing and Directing Issuance of Mandate). Fairness requires the rule of law be applied consistently, regardless of the gravity of the punishment assessed.

I also continue to assert this Court should adopt a more enlightened unified "*Spuehler*-type" rule of appellate review regardless of whether the evidence is direct or circumstantial. *See White v. State*, 900 P.2d 982, 996 (Okl.Cr.1995) (Lumpkin, J. Specially Concurring). However, the evidence in this case is more than sufficient regardless of the standard applied.