Versie Mae DRAKE, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13977.

Court of Criminal Appeals of Oklahoma.

Feb. 7, 1968.

Graham & Petroff, Oklahoma City, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Hugh H. Collum, Asst. Atty. Gen., for defendant in error.

BUSSEY, Judge.

Versie Mae Drake, hereinafter referred to as defendant, was charged, tried and convicted for the crime of Murder in the District Court of Oklahoma County. She was sentenced to life imprisonment in the State Penitentiary on November 5, 1965, and from that judgment and sentence she appeals.

Odessa Thompson was the State's first witness. She testified that on the evening of December 25, 1964, she went to defendant's home for egg nog, arriving at about 8:30 p. m. Shortly thereafter, Mr. and Mrs. Drake had an argument, but this soon passed over. Mrs. Drake asked her husband for twenty-five cents to buy a package of cigarettes. He refused to give her the money but gave twenty-five cents to Fannie LaDay to play the juke box. At this point the defendant said, "You black son-of-a-bitch, I'll kill you." She then went to the bed, got a gun, fired one shot over Odessa's shoulder. This witness testified that she ran out the door and heard several more shots fired, then came back in and told Fannie "Let's get out of here." She stated that Fannie helped Mrs. Drake and a young boy pour out the choc beer. On cross-examination she testified that Mr. Drake had been making passes at Fannie LaDay.

Dr. Clarence Shields, Jr. testified that he was on duty at Mercy Hospital when the body of Andy Clay Drake was brought in. He was dead on arrival, caused by gunshot wounds about the head and neck.

Dr. James C. Hulsey, the County Medical Examiner, testified that he went to Rolfe Funeral Home on December 26, 1964, examined Andy Clay Drake, and found that he had a gunshot wound between the eyes and another bullet entered the right side of his jaw and came out the left side. He further testified that he signed the death certificate.

Roy Lee Gill testified that on December 25, 1964, he went to the Drake house to purchase a half pint of whiskey; that he was standing next to the juke box when the first shot was fired and he jumped behind the bed. He did not see the shots fired, but he was present when the police came and asked who did the shooting and Versie Mae Drake said, "It was I."

Fannie Lee Mays, one and the same as Fannie LaDay, testified that on the date in question she went to the Drake home to pick up her Christmas present. When she came out of the bathroom she heard the shots and Mrs. Drake was still standing there, "squeezing the trigger." She then stated Mrs. Drake said, "Lord, what have I did?"

Henry McMullen, Jr. testified that he was a police officer with the Oklahoma City Police Department on December 25, 1964, that he received a call and he and Officer Douglas went to 714 N.E. 9th, went inside and found Mr. Drake lying on the floor. At the time Mrs. Drake, Roy Lee Gill, Grace Ramsey and Roy Lee Ramsey were there at the home. The officers secured the area, called an ambulance to pick up the body, and found a .32 caliber revolver under a pillow.

Officer Emmett D. Douglas testified to these same facts and Officer N. L. Barber testified that he was with the identification section and took photographs which were introduced into evidence.

Jack Jordan testified that he did not advise Versie Mae Drake of her constitutional rights when she stated, "I shot my husband with that gun." However, at the police station he did advise her of her rights.

Charles E. Greeson testified that he first saw Versie Mae Drake at the women's jail on December 26, 1964, that he advised her

of her constitutional rights and that she was entitled to an attorney. He asked her if she would like to talk to him and she answered yes, and gave him her confession.

Officer Jack Jordan was recalled as a defense witness, and in his testimony it was brought out that no paraffin test was made and no ballistic tests were made on the bullets.

Sgt. Tom Heggy was called, but he was not allowed to testify.

Lucille Hardison testified that she was Versie Mae Drake's sister, that on December 25, 1964, Andy Clay Drake was making passes at Fannie LaDay, and the defendant shot him. She further stated that the defendant had "fits" (epileptic seizures) and on one occasion in Kansas Mr. Drake had cut Lonnie Bank's throat.

Roy Lee Gill was recalled as a defense witness and his testimony amounted to nothing more than at times the defendant would not speak to him.

Lonnie Banks testified that on one occasion Mr. Drake cut his throat and of another time when Mr. Drake pulled a gun on Mrs. Drake.

Under the first proposition of her brief, defendant argues that the State failed to meet its burden of proving the corpus delicti before introduction of evidence of a "confession" by the defendant. The argument proceeds on the notion that the State proved the death of the victim, but failed to establish independently of the "confession" that such death was caused by the defendant.

■ The defendant apparently feels that there should have been some direct and/or scientific evidence to show that the bullet or bullets which killed the victim came from the gun wielded by the defendant. Circumstantial evidence is just as good in a homicide case as it is in any other case. It has been held in Oklahoma that where a dead body is found with marks of violence upon it, or other circumstances that indicate that the deceased came to his or her death by unnatural or violent means, proof

of such fact, independent of defendant's confession, establishes the corpus delicti in a murder case.

In 40 C.J.S. Homicide § 201, the following is stated:

"It is not necessary that the corpus delicti should be proved beyond a reasonable doubt before other evidence may be introduced which corroborates it or strengthens reasonable inferences drawn therefrom."

\* \* \* \* \* \*

"In the absence of other evidence that a crime has been committed it is improper in the trial of a homicide case to admit in evidence the confession of accused, but such confessions are properly admitted in conjunction with other evidence of the corpus delicti, as where there is evidence from which the jury might reasonably infer the commission of the offense charged, *it being unnecessary to establish the corpus delicti beyond a reasonable doubt before evidence of the prisoner's confession can be admitted.*" [Emphasis added].

■ In the instant case it was established by persons other than the defendant, Odessa Thompson and Fannie Lee Mays, that the defendant shot the victim. There was no evidence that anyone else shot him. From these facts by themselves the jury could reasonably infer the criminal agency of the defendant.

"The cross-examination of a witness and the method, conduct, scope, range, extent, and limitation of such cross-examination are within the trial court's discretion, which will not be interfered with in the absence of abuse thereof."

In reviewing the entire record, we find that the trial of the instant case was not smooth. Difficulties in understanding the language of the witnesses are apparent throughout the record. The numerous objections made by both defense counsel and the prosecuting attorney made the task of the trial judge in conducting this trial, anything but easy. It is against this background of an unusually stormy trial that the judge's conduct must be viewed and judged to determine if there was in fact any abuse of discretion which resulted in prejudice to the defendant.

■ Under the defendant's fourth proposition, she argues that defense counsel should have been allowed to introduce evidence of the deceased's criminal record as shown by the prison records of the Kansas State Penitentiary. Whether this document was a "rap sheet" or just what it was is not clear from the record. The rule is well established in Oklahoma that proof of former convictions is properly made by offering in evidence the judgment and sentence or commitment, and by proving the identify of the person named in the aforementioned documents. Gilmore v. State, Okl.Cr.App., 365 P.2d 573; Woods v. State, Okl.Cr.App., 327 P.2d 720; Morse v. State, 63 Okl.Cr. 445, 77 P.2d 757.

■ In the absence of any showing in the trial record that the "record" offered by defense counsel in evidence was a duly certified and authenticated copy of the judgment and sentence from a Kansas court—whether actually obtained from a court clerk or from the prison records clerk, either of whom might legitimately be custodians of such documents—we are of the opinion that defendant's fourth proposition is without merit.

Under the fifth and sixth propositions of defendant's brief it is argued that the trial court should have instructed on the defense of insanity and that the defendant's requested instructions on self-defense and/or mitigating circumstances should not have been refused.

It is to be noted that the trial judge gave defendant's requested instructions in part. A reading of Instructions No. 9 and 10, clearly show that the court did adequately instruct on self-defense.

■ As to the matter of insanity, it is defendant's contention that evidence in the record supports an instruction on this theory of defense. Defendant refers us to the testimony of witnesses at two places in the record. An examination of these references reveal that the witness Lucille Hardison spoke of the defendant's having "fits" and being a person of some violence, that is, biting, chewing, kicking, falling down, and foaming at the mouth. The other witness is Roy Lee Gill, who said that the defendant "wouldn't want to be bothered and she wouldn't have nothing to say to nobody." Nowhere does it appear that either of these witnesses expressed an opinion as to the sanity of the defendant at the time of the commission of the crime. We are of the opinion and therefore hold, that this assignment of error is wholly without merit.

The final matter argued in defendant's brief concerns the alleged "confession" of the defendant. Whatever the statement or statements made by the defendant, it is conceded that they were made at a point in time sometime between the date of the decision by the U. S. Supreme Court in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and the same court's decision in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

In the majority opinion in Escobedo at its conclusion the Court says:

"Nothing we have said today affects the powers of the police to investigate an 'unsolved crime' * * * by gathering information from witnesses and by other 'proper investigative efforts'. * * * We hold only that when the process shifts from investigatory to accusatory —when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and,

*under the circumstances here*, the accused must be permitted to consult with his lawyer." [Emphasis added.]

It is to be remembered that the facts of Escobedo show that the accused already had retained a lawyer in his case and that the lawyer was present at the police station seeking to see the accused at the time that the confession concerned was obtained by the police officers.

■ The facts of our instant case clearly show that the police officers walked into the house which was the scene of the crime and made a general inquiry as to what had happened. The defendant spoke up, and said she had shot her husband. Under neither Escobedo nor Miranda was defendant's statement inadmissible. She later repeated the same statement at the police station. The facts surrounding the later confession at the police station appear in the record at pages 378–380 of the case-made, when Officer Jordan was testifying:

"Q. Officer Jordan, will you start at the beginning of the conversation and relate to us as near as you can remember exactly what was said, the questions that were asked and the answers that were given?

A. I came in from the investigation, went to the jail, women's jail, where I obtained the defendant, brought her downstairs to the second floor to the Detective Bureau, and there I told her that she did not have to talk to me, that anything that she did say would be used against her; and that I was in all probability going to file a charge of murder for the death of her husband in the shooting of her husband. I then asked her—

Q. Now, officer, did you advise her as to whether or not she had a right to request counsel?

MR. PETROFF: Objection.

THE COURT: Mr. Cooper, that's a leading question.

A. She was advised that she was in need of counsel.

Q. Who advised her of that?

A. I did.

 *     *     *     *     *     *

Q. All right, sir. After you had made those statements to the defendant, did you have a conversation with her?

A. I did.

Q. Would you relate to us as near as you can remember exactly what was said and who said it?

A. I asked her why she had shot her husband.

 *     *     *     *     *     *

A. I asked her why she had shot her husband. Her answer to this was that she had asked her husband not to have an affair, and that he continued to make advances and give her money and she became angry and shot him and attempted to shoot Fannie Mae. She stated that she did empty the gun. I then asked her if she would give a written statement to this effect at which time her answer was 'no,' and this ended my conversation with her."

As we have earlier pointed out, the trial of this case was conducted prior to the Miranda decision and the ruling in Miranda has been applied prospectively and not retroactively. See Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882.

It is clear from the foregoing excerpt of the record that the defendant, after having been advised of her constitutional rights, freely and voluntarily confessed to the slaying of her husband. We are, therefore, of the opinion that this assignment of error is without merit.

■ As we have heretofore stated, the trial of this case was a particularly stormy one, and both counsel for the State and the defense conducted themselves in a manner leaving much to be desired and it was necessary on numerous occasions for the court to admonish counsel and while in a close case such conduct by the respective parties might have necessitated a reversal, it is abundantly clear in the instant case that

the defendant shot and killed her husband when she was jealous and angry, and it is also abundantly clear that the bickering between the attorneys and their general conduct throughout the trial necessitating the court's frequent admonitions, had a prejudicial effect upon the jurors which caused them to impose a greater sentence than would ordinarily have been imposed under a similar factual situation.

We have reviewed many cases where the facts were almost identical to those in the instant case and the defendant was convicted of the included offense of Manslaughter in the First Degree and sentenced to a term of years for that crime. Therefore, we are of the opinion that in the interest of justice, in view of the prejudicial conduct of the parties and other errors not so fundamental as to require reversal, that the judgment and sentence of life imprisonment for the crime of Murder should be, and the same is hereby, modified to a judgment and sentence of Twenty (20) years imprisonment in the State Penitentiary for the included offense of Manslaughter in the First Degree, and as so modified, the judgment and sentence appealed from is affirmed.

NIX, P. J., and BRETT, J., concur.