1998 OK CR 59

**George James MILLER, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F 96–1380.**

Court of Criminal Appeals of Oklahoma.

Nov. 5, 1998.

Rehearing Granted Feb. 19, 1999.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Brad Miller, Asst. Dist. Atty., Oklahoma City, for the State at trial.

Barry Albert, George Miskovsky, III, Asst. Public Defenders, Oklahoma City, for Defendant at trial.

Andrea Digilio Miller, Asst. Public Defender, Oklahoma City, for Appellant on appeal.

W.A. Drew Edmondson, Atty. Gen., Jennifer B. Miller, Asst. Atty. Gen., Oklahoma City, for Appellee on appeal.

## OPINION

LANE, Judge:

¶ 1 George James Miller was tried by jury and convicted of First Degree Murder (21 O.S.1991, § 701.10) in Oklahoma County District Court Case No. CF–94–8859 before the Honorable Charles L. Owens, District Judge. The jury sentenced Miller to death after finding four aggravating circumstances. Miller is before the Court on original appeal from this Judgment and Sentence. We **AFFIRM.**

### FACTS

¶ 2 Twenty-five year old Kent Dodd worked as the night auditor for the Central Plaza Hotel located at the intersection of I–40 and Martin Luther King Drive in Oklahoma City. Dodd registered a guest at approximately 3:15 a.m. September 17, 1994. Shortly thereafter he was attacked by an assailant who stabbed him repeatedly, beat him with hedge shears and a paint can, and poured muriatic acid on him and down his throat. Two and a half hours later a housekeeper arrived for the morning shift. She called for Dodd when she saw he was not at the front desk. In response, she heard "animal moans" from the unused restaurant area of the hotel. She ran to a nearby restaurant and had the police summoned. Dodd was still alive when the police found him.

¶ 3 Dodd was able to respond to police questioning, but most of his responses were unintelligible, perhaps due to the acid burns in his mouth and throat. The police were

able to understand him say his attacker was a black man who wore gray pants. Dodd died later that day at the hospital from blunt force trauma to his head.

¶ 4 All of the evidence against George Miller is circumstantial. Miller's sandals could have left the bloody footprints found at the scene, but could not be exclusively identified. A microscopic drop of blood found on Miller's sandal was consistent with Dodd's blood, but also could not be exclusively identified. Miller told police he was home with his wife at the time of the murder. The Millers were divorced by the time of trial, and she testified he was not home; he had taken her car keys from the place where she hid them under the mattress and left. The next day she found sand in the car. She also testified she did the family laundry, and after the murder a pair of Miller's khaki shorts and a silk shirt disappeared. She identified two buttons found at the crime scene as consistent with buttons on the missing shirt.

¶ 5 The evening before the murder Miller was broke and tried unsuccessfully to borrow money from several different friends including one who lived at the Central Plaza Hotel. The morning after the murder Miller gave his wife one hundred and twenty dollars. When questioned by police about this, he claimed he had cashed a paycheck. When they reminded him he was not working at the time, Miller denied he gave his wife the money.

¶ 6 The hotel cash drawer was open and empty when the police investigated the crime scene. Hotel policy requires each shift to begin with two hundred and fifty dollars in the drawer. At the end of the shift the desk clerk places any amount in excess of this in a deposit envelope and drops it into the hotel safe. Only desk clerks knew the amount of cash in the drawer.

¶ 7 Kent Dodd was an exemplary employee who followed the accounting procedures carefully, and whose money count was always correct. After the murder the hotel manager tried to determine whether any money had been taken. She discovered a deposit envelope containing one hundred dollars hidden behind registration forms in a separate drawer. The next day Miller told a friend that robbery could not have been the motive

for the killing, because only one hundred fifty dollars was kept in the cash drawer.

¶ 8 Miller had worked as a maintenance man at the Central Plaza Hotel for two weeks about a month before the murder. Dodd knew Miller, but knew him under an alias, Jay Elkins. Photographs of the crime scene revealed what appears to be finger writing in the blood on the floor and wall which could be the letter "J" and the word, "Jay."

¶ 9 Miller and his wife split up shortly after the murder, and he went to stay with his mother in Sherman, Texas. When police questioned him about the Dodd murder, he cried.

**PRETRIAL ISSUES**

¶ 10 Miller was serving a federal sentence at Leavenworth, Kansas at the time charges were filed against him in Oklahoma for the murder of Kent Dodd. Consequently he was brought to Oklahoma pursuant to the Interstate Agreement on Detainers Act (IADA). 22 O.S.1991, §§ 1345 et seq. Title V of that Act provides trial shall commence within 120 days of the date the defendant is brought into the jurisdiction or charges shall be dismissed. In Proposition I Miller argues the prosecutor denied him due process by filing the Bill of Particulars late and thereby forcing him to choose between a speedy trial under the IADA, and effective assistance of counsel as guaranteed by the state and federal constitutions.

 ¶ 11 This issue was raised and thoroughly addressed at a pre-trial motion hearing. Defense counsel advised the trial court he was aware of Miller's detainee status from the time of his appointment. Miller adamantly asserted his right to go to trial within the 120 days provided by the IADA, and defense counsel Barry Albert advised the trial court he would be ready for trial. The danger of an apparent forced choice between competent counsel and speedy trial was recognized and addressed by the trial judge, the prosecutor, defense counsel, and the defendant. Defense counsel made clear he would be ready for trial, and at the beginning of the jury trial, he announced he was ready. The

record shows unequivocally defense counsel was prepared for trial.

¶ 12 In support of this argument, Miller argues the State filed the Bill of Particulars so late that he was denied due process. Miller never objected to the filing of the Bill of Particulars. On appeal he concedes the filing complied with the definition of "adequate notice" set forth in *Hunter v. State,* 1992 OK CR 19, ¶ 5, 829 P.2d 64, 65, that is, it was filed at the time of arraignment. He argues this definition does not control in this special case where the IADA clock was running. To support this position Miller relies on dicta in *Marquez v. State,* 1995 OK CR 17, ¶ 6, 890 P.2d 980, 983, and argues the proper time for the Bill of Particulars to be filed was when the district attorney knew he would seek the death penalty.

¶ 13 The adequacy of notice can only be determined within the context of the circumstances of the particular case. In this case, defense counsel advised the trial court he began amassing mitigation evidence the day he was appointed, July 17, 1996. Counsel repeatedly advised the trial court he would be ready to try the case and at no time did counsel request a continuance. This case differs significantly from *Marquez* in which counsel had only eighteen days notice that the State sought the death penalty; he advised the trial court he could not be ready for trial in that amount of time, and he requested a continuance on this basis which was denied by the trial court. *Id.* Under the circumstances of the case before us, no evidence supports a finding the notice was not adequate.

■ ¶ 14 Miller also argues the prosecutor abused his discretion by filing the Bill of Particulars, and the IADA bars the State from filing a Bill of Particulars *after* the detainer has been filed with the custodial jurisdiction. An abuse of discretion in the filing of a Bill of Particulars will be found where the filing is based on impermissible discriminatory grounds. *Carter v. State,* 1994 OK CR 49, ¶ 53, 879 P.2d 1234, 1251, *cert. denied,* 513 U.S. 1172, 115 S.Ct. 1149, 130 L.Ed.2d 1107 (1995). The grounds cited by Miller are that he was forced to choose between effective assistance of counsel and a speedy trial. Defense counsel stated unequivocally he would be prepared for trial, and he was. The record defeats this argument.

■ ¶ 15 Miller interprets the silence of the IADA on the question of filing the Bill of Particulars after filing the detainer with the custodial jurisdiction to mean the filing is not authorized. He argues the filing improperly adds a charge, or substantially changes the nature of the charges. Even if we were to accept the argument that the filing changed the charge, which we do not, Article V of the IADA defeats it. Article V, section (d) of the Act provides:

> The temporary custody referred to in this agreement shall be only for the purpose of permitting prosecution on the charge or charges contained in one or more untried indictments, informations or complaints which form the basis of the detainer or detainers or for prosecution on *any other charge or charges arising out of the same transaction.* (emphasis added)

22 O.S.1991, § 1347.

¶ 16 Miller's final argument against the Bill of Particulars reiterates earlier arguments: he was forced to choose between a speedy trial under the Act and effective assistance of trial counsel. As we have discussed, the record is unambiguous and emphatic; counsel was prepared for trial.

## JURY SELECTION

¶ 17 During *voir dire* the following exchanges took place as two prospective jurors expressed concern about imposing the death penalty.

> Prospective Juror Robins: Because I have thought about this before, and in the past I've always thought that I would have hated to be the one-when I imagine somebody in a white coat going in and administering the shot to them, and I always thought I would hate to be that person.
>
> The Court: I think we all would.
>
> Prospective Juror Robbins: And in this case if I were on the jury, I would be one of 12 people that would actually be administering that shot.
>
> Prosecutor Miller: Judge, I'm going to ask that we take this up at the bench.

The Court: I don't think we need to. In essence perhaps that might be true, realistically the jury determines what you feel to be proper by way of sentencing. That means your duty if that verdict should be death by lethal injection, that would be what you would say in your verdict, and that's all you would do. That would be the end of it.

...

The Court: Can you give meaningful consideration and agree to a verdict of death by lethal injection if you felt it was justified by all the evidence?

Prospective Juror King: No.

The Court: Why is it that you could not consider that?

Prospective Juror King: Because I believe that only God has the right to take a life, I don't.

The Court: Juries don't take lives, they return verdicts, the verdict they feel fits that case. And as you've heard me say before, jurors reluctantly serve on death qualified juries sometimes. Can you not do that?

¶ 18 In Proposition II Miller relies on *Caldwell v. Mississippi*, 472 U.S. 320, 328, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231, 239 (1985) to argue these comments by the trial judge reduced the jury's sense of responsibility resulting in an unfair trial. The *Caldwell* Court held it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that *the responsibility for determining the appropriateness of the defendant's death* rests elsewhere." (Emphasis added.) *Id.* In that case the prosecutor argued in closing that the jury's sentencing decision was automatically reviewed by the State Supreme Court. *Id.* at 326, 105 S.Ct. at 2638.

■ ¶ 19 Judge Owens' remarks in this case placed the *sentencing* decision squarely where it belongs-on the shoulders of the jury. There is no error here.

¶ 20 In Proposition III Miller argues the trial court abused its discretion in dismissing prospective jurors for cause. He asserts Venireman Munson should have been removed for cause but was not, while Veniremen Stevens and Perry should not have been removed for cause, but were.

■ ¶ 21 The standard for striking a prospective juror for cause based on his or her views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *Knighton v. State*, 1996 OK CR 2, ¶ 15, 912 P.2d 878, 885, *cert. denied,* —— U.S. ——, 117 S.Ct. 120, 136 L.Ed.2d 71 (1996). A venireman who is willing to consider all sentencing options and who is not "irrevocably committed" to one sentence before trial has begun is fit to serve and not vulnerable to removal for cause. *Hain v. State*, 1996 OK CR 26, ¶ 21, 919 P.2d 1130, 1138, *cert. denied,* —— U.S. ——, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996).

■ ¶ 22 Venireman Munson expressed a belief that he could impose a sentence of life or death, but not life without the possibility of parole. (TR2,126–27). Following further explanation by the trial court he stated he could consider all three punishments. (TR2,129) Upon examination by defense counsel he stated he could not "imagine a situation where I would agree with it." (TR2,135) However, when he was then asked by the trial court whether he could examine the possible punishments and decide on the one he believed to be appropriate, he answered, "Yes, sir." We find no abuse of discretion by the trial court refusing to remove this venireman for cause.

■ ¶ 23 Veniremen Stephens and Perry each stated unequivocally they could not consider the death penalty under any circumstance. The trial court asked each venireman appropriate questions to plumb this issue, and with further questioning, the answers clearly indicated these veniremen could not follow their oath, for they would not be able to consider the death penalty. These veniremen were removed properly for cause. We find no error here.

### ISSUES ARISING IN THE GUILT/INNOCENCE STAGE OF TRIAL

¶ 24 Miller raises eight propositions of error addressing alleged error in the first

stage of trial. In Proposition IV he argues the evidence was insufficient to prove him guilty of the murder of Kent Dodd.

¶ 25 Miller correctly points out no fingerprint or hair evidence connects him to the crime. No blood evidence conclusively places him at the scene. There were no eye-witnesses. The substantial amount of circumstantial evidence, which Miller ignores, is this: 1) Microscopic amounts of DNA consistent with that of the victim were found on Miller's right sandal; 2) Footprints left at the scene could have been made by Miller's sandals; 3) The size and interlocking dog-bone pattern of the sole and prints are consistent; 4) Two buttons found at the scene are consistent with those of Miller's shirt which disappeared after the murder; and 5) Miller's khaki shorts disappeared after the murder.

¶ 26 Miller told police he was home with his wife at the time of the murder. She testified he was not home; he was out with her car. The next morning she found sand in her car. Miller had no money the night before the murder; the morning after he gave his wife one hundred twenty dollars. One hundred twenty-two dollars was missing from the motel cash drawer. Miller told police he got the money by cashing a pay check. When the police confronted him with the fact he was not working at the time, he denied giving his wife the money.

¶ 27 The day after the murder Miller told a former co-worker from the hotel that the robbery could not have been the motive because only $150.00 was kept in the cash drawer. Only desk clerks knew this amount. In fact $250.00 was kept in the cash drawer, but Dodd had placed $100.00 in another drawer prior to the murder. Letters drawn in blood at the scene appear to be the letter "J" and the word "Jay." Dodd knew Miller as Jay Elkins. Finally, Miller cried when police questioned him about the murder, and he made it clear to the police he was not grieving the victim.

¶ 28 When, as here, the State introduces only circumstantial evidence, that evidence is sufficient to prove guilt only if, when viewed in the light most favorable to the State, it rules out every reasonable hypothesis other than guilt. *Bryan v. State*, 1997

OK CR 15, ¶ 37, 935 P.2d 338, 358, *cert. denied*, —— U.S. ——, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997); *Cheatham v. State*, 1995 OK CR 32, ¶ 26, 900 P.2d 414, 422. The evidence in this case is sufficient to prove guilt.

¶ 29 Polymerase Chain Reaction (PCR) DNA testing conducted on Miller's right sandal revealed human DNA consistent with that of the victim, Kent Dodd. The State's expert testified the DNA could not be used to conclusively identify Dodd as the donor. It could have come from 1 in 19 Caucasians, 1 in 16 African–Americans or 1 in 55 Hispanics. Miller argues in Proposition V this evidence was not admissible.

¶ 30 Miller first argues the trial court failed to conduct a *Daubert/Taylor* hearing to determine admissibility. Such a hearing is required when a party seeks to admit evidence developed through a novel scientific procedure. *Taylor v. State*, 1995 OK CR 10, ¶ 44, 889 P.2d 319, 327. At the time of Miller's trial, PCR DNA analysis was a novel scientific procedure, and an *in camera* hearing to determine admissibility should have been conducted, but was not. The failure to hold a *Daubert/Taylor* hearing is error.

¶ 31 Polymerase Chain Reaction DNA analysis has been accepted in Oklahoma as admissible in criminal trials. *Wood v. State*, 1998 OK CR 19, ¶ 40, 959 P.2d 1, 11. Therefore, we find the failure to hold a hearing to determine admissibility is harmless beyond a reasonable doubt.

¶ 32 Miller next argues the evidence was not reliable. To support his position he relies on testimony by Dr. Hanas, a defense witness who had never worked with the PCR method of DNA testing. Dr. Hanas testified the photocopy of the test result indicated the test was inconclusive because a necessary control dot was not visible. The trial court took evidence which established this control dot, though faint, was visible on the original test. The basis for Dr. Hanas' conclusion thus was discredited, and the State presented sufficient evidence to prove reliability of the PCR test.

¶ 33 Miller's final challenge to this evidence also addresses reliability. Dr. Hanas testified the sample was too small to be analyzed. The State's witness, Dr. Moses Schanfield, testified to the ability of PCR analysis to test extremely small samples. Dr. Schanfield explained that of four tests conducted on the sample of DNA obtained from Miller's right sandal, only the PCR test, the most sensitive test, yielded any results. Dr. Hanas seriously weakened his own credibility when he admitted he had no experience with PCR DNA analysis. The State presented sufficient evidence to establish the reliability of PCR DNA testing sufficient to warrant admission at trial.

¶ 34 In his final challenge to the admissibility of the PCR DNA analysis in his case, Miller argues the results are not exclusive enough to be reliable. Dr. Schanfield testified the DNA found on Miller's right sandal could have been produced by 1 in 19 Caucasians, 1 in 16 African–Americans and 1 in 55 Hispanics. We agree the large pool of possible donors weakens this evidence considerably.

¶ 35 To be reliable a scientific test must measure what it purports to measure. Miller does not suggest the PCR DNA evidence does not replicate DNA sequences and determine the frequency of these sequences in the population. Rather, he argues the pool of potential donors in this case is so large, that the evidence is not reliable. This argument appears to address the *relevance* of the evidence rather than its reliability. To be admissible as relevant, evidence need only have any tendency to make the existence of a fact in consequence more or less probable than it would be without the evidence. 12 O.S.1991, § 2401. The population frequency statistics meet this standard. Separate and distinct from the question of relevance and reliability, is the question of the strength of the evidence. Evidence which is both reliable and relevant may nevertheless be weak. The PCR DNA evidence in this case was admitted properly and the defense appropriately exposed its weakness to the jury.

¶ 36 Bloody footprints left at the scene *could have been* made by sandals owned by Miller. The State's expert carefully explained that while the size and "inter-locking dog bone" pattern of the sole was "consistent" with the footprints found at the scene, Miller's sandal could not be identified conclusively as the source of the print, for no unique flaws in the sole of the sandal were present in the footprint. The expert explained blood is an imperfect medium for the forensic identification of footprints, for it fills in the very flaws used for exclusive identification. Miller argues in Proposition VI this evidence lacked relevance and was inadmissible.

¶ 37 Relevance, as we explained above, is distinct from the weight of evidence. To be relevant evidence need only have "any tendency" to make more or less probable any "fact of consequence" to the trial. 12 O.S. 1991, § 2401. Who left the footprint is a fact of consequence to the determination of who committed the crime. Consistency between the sole of Miller's sandal and the crime scene footprint is sufficient to meet the evidentiary standard of relevance. Miller suggests that to be "relevant," evidence must conclusively identify the perpetrator of a crime. This, obviously, is not the standard. If it were, most of the evidence admissible today would no longer be admitted at trial.

¶ 38 In Proposition VII Miller alleges four evidentiary errors. The first is a classic evidentiary harpoon delivered by Detective Craig Gravel when he testified regarding the relationship between Miller and his, by then, ex-wife.

Q.: And they were breaking up. Did she tell you that?

A.: No, she didn't tell me that.

Q.: Did she tell you that she told him to get out of the house and she told him to go someplace else?

A.: After he beat her up, yes, she told him to leave.

Miller argues this harpoon requires reversal of the guilt stage of trial. We agree this is an evidentiary harpoon. It was delivered by an experienced police officer, it was voluntary—that is, not responsive to the question asked—it was jabbed willfully, it injected information of other crimes, and it prejudiced the defendant. *Riley v. State*, 1997 OK CR

51, ¶ 9, 947 P.2d 530, 533; *Robinson v. State*, 1995 OK CR 25, ¶ 47, 900 P.2d 389, 402–03.

¶ 39 The prejudice prong is weakened considerably by the fact Miller's ex-wife testified more completely to the entire incident without objection by the defense. As this evidence ultimately was properly admitted, we find the harpoon which changed the timing, but not the substance of the evidence, was harmless beyond a reasonable doubt.

¶ 40 During his cross-examination of the State's DNA expert, defense counsel repeatedly asked the witness variations of the same question, and was admonished by the trial court to move on to another question. Counsel moved for a mistrial on the grounds "some jurors were giggling and laughing" and that the trial judge commented on the evidence. The trial court overruled the motion.

¶ 41 The scope, extent, and method of cross-examination rests with the sound discretion of the trial court whose decisions will not be disturbed on appeal absent an abuse of that discretion. *Drake v. State*, 1968 OK CR 27, ¶ 20, 437 P.2d 461, 464. The trial judge appropriately stopped counsel from repetitive badgering of the witness, and did not comment on the evidence. We find the trial court properly exercised its discretion in managing the cross-examination and correctly denied the motion for mistrial.

¶ 42 The State's shoe print expert, FBI criminalist Sarah Wiersema, created an acetate overlay of a lifesize imprint of the sole of Miller's sandal, State's Exhibit No. 96. During her testimony, she placed it over a life size photograph of a bloody shoe print found at the scene of the crime. The size and shape of the prints matched. The defense objected on the grounds the overlay had not been provided to the defendant prior to trial. The trial court overruled the objection and admitted State's Exhibit No. 96 on the grounds the State had provided the defense with the sandal, the State's photograph of the sandal's sole, and photographs of the bloody footprints left at the scene.

¶ 43 The defense filed a Motion for Discovery requesting, among other things, all evidentiary material, and all prosecution exhibits that would be introduced at trial. (OR 82–3). The failure of the State to furnish State's Exhibit No. 96 to the defense was error. *Allen v. District Court of Washington Co.*, 1990 OK CR 83, ¶ 20, 803 P.2d 1164, 1169. *Allen* mandates "appropriate relief" to a party aggrieved by discovery violations. Denying admission of the evidence is a sanction available to the trial court; so is forcing the offending party to disclose the evidence, and granting the offended party a continuance. *Id.* The trial court erred by failing to recognize the prosecutor's error; however, in the context of this trial, relief is not warranted. The trial court correctly concluded the defense could not be surprised by the content of this exhibit. The State had furnished to the defense life-size photographs of the footprints and the sole of Miller's sandal, as well as the sandal itself. We do not find an abuse of discretion by the trial court in allowing admission of the exhibit.

¶ 44 The fourth and final issue raised in this proposition of error is that the victim's father introduced victim impact testimony into the first stage of trial. Mr. Dodd testified his son was unable to play some sports as a child because he was missing a muscle in his chest as a result of a birth defect. He explained the missing muscle caused a lack of upper body strength. This, Miller argues, injects improper sympathy for the victim. We disagree. This defense brought out the fact Miller had no scratches or bruises the morning after the murder. This testimony is relevant to the question of why this might be so. The testimony regarding Dodd's inability to play sports is not gratuitous pandering to the jury, it merely explains the extent of the lack of upper body strength. This evidence is relevant and was properly admitted.

¶ 45 Toward the close of his cross-examination of the State's DNA expert, Moses Schanfield, defense counsel Barry Albert asked the trial court to allow co-counsel George Miskovsky III to continue with the cross-examination. The trial court denied this request, and allowed Mr. Albert to continue with the cross-examination and to consult with Mr. Miskovsky. In Proposition VIII Miller argues the trial court improperly restricted this cross-examination.

¶ 46 The scope and method of cross-examination is to be managed according to the sound discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. *Drake*, 1968 OK CR 27, ¶ 20, 437 P.2d at 464. The trial court did not limit the scope of cross-examination, for Mr. Albert was able to obtain questions from co-counsel, and was able to complete the cross-examination. In support of the argument Miller alludes to the fact Mr. Albert tried to be replaced after he was admonished by the judge to move to another question. Mr. Albert expressed the belief he had lost credibility with the jury. Miller argues that after counsel lost his credibility as a result of admonishment by the trial court, the court forced him to continue his, now ineffective, cross-examination.

¶ 47 Nothing in the record supports this conclusion. Mr. Albert continued to question the witness after the trial court's appropriate admonishment, and the record supports a conclusion he effectively questioned this witness without further interruption of any kind. Counsel was able to complete an effective cross-examination, and the trial court did not abuse its discretion.

¶ 48 Defense counsel objected at trial to the introduction of photographs of the victim. An *in camera* hearing was held at which the trial court reviewed the photographs and disallowed a number of them. Photographs of the crime scene were admitted without defense objection. In Proposition IX Miller concedes the relevance of these photographs, but argues the danger of unfair prejudice substantially outweighs relevance, and thus the photographs are inadmissible. *See* 12 O.S.1991, § 2403. Miller points to two sources of unfair prejudice: multiple photographs of the victim, and magnification of the photographs on an "overhead monitor." Miller's objection to multiple photographs of the victim is preserved for appellate review; objection to the crime scene photographs is raised for the first time on appeal, and is reviewed for plain error only. *Perry v. State*, 1995 OK CR 20, ¶ 41, 893 P.2d 521, 531.

¶ 49 Admission of evidence is left to the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *McGregor v. State*, 1994 OK CR 71, ¶ 27, 885 P.2d 1366, 1381, *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995); *Woodruff v. State*, 1993 OK CR 7, ¶¶ 42–45, 846 P.2d 1124, 1136–37, *cert. denied*, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993). Photographs of the victim are not unduly repetitive, and we find no abuse of discretion in their admission into evidence. The photographs of the crime scene accurately depict it and are admissible. The fact they were magnified during projection does not introduce unfair prejudice in this case.

¶ 50 In final closing argument the prosecutor showed the jury State's Exhibit No. 55, a photograph of the blood on the floor and walls of the crime scene. The prosecutor told the jury the most important evidence had almost been overlooked, for they could see the victim "went into his own blood . . . and wrote his killer's name." The prosecutor then produced a transparent overlay with "Jay" written on it. He placed the overlay on top of State's Exhibit No. 55 and matched up the written "Jay" with the bloody image on the wall. No contemporary objection was lodged. Over an hour later the defense objected and demanded a mistrial which was overruled by the trial court.

¶ 51 In Proposition X Miller argues the State failed to give the defense notice of this "evidence" and therefore it was not admissible. We review for plain error, for the defense did not object in a timely way. *Perry*, 1995 OK CR 20, ¶ 42, 893 P.2d at 531.

¶ 52 Contrary to Miller's argument, State's Exhibit No. 55 is not evidence. It was not introduced into evidence and it was not taken into deliberations by the jury. Rather, it demonstrated a reasonable inference from evidence properly disclosed to the defense and properly admitted at trial. In this regard the transparency is akin to counsel writing with chalk on a blackboard. Counsel for both the defense and State are granted wide latitude to draw reasonable inferences from the evidence. *Le v. State*, 1997 OK CR 55, ¶ 50, 947 P.2d 535, 554, *cert. denied*, — U.S. ——, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998); *Spears v. State*, 1995 OK CR 36, ¶ 59, 900 P.2d 431, 445, *cert. denied*, 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527

(1995). State's Exhibit No. 55 falls squarely within this latitude.

¶ 53 In Proposition XI Miller alleges twenty-eight instances of prosecutorial misconduct in the first and second stages of trial. We have reviewed each instance and found the comment was not error, or the error was cured by the trial court sustaining defense objection. We find no error here.

## SECOND STAGE ISSUES

¶ 54 The State alleged four aggravating circumstances, including, "The defendant was previously convicted of a felony involving the use or threat of violence to the person." 21 O.S.1991, § 701.12(1). In support of that aggravator the State presented witnesses as well as Judgments and Sentences to prove Miller was convicted of First Degree Burglary in 1988 and Pointing a Firearm in 1992. The State also presented evidence of two convictions for crimes which occurred after the Dodd murder, escape and facilitating escape. In Proposition XII Miller argues the admission of these is error because they occurred after the Dodd murder, and because no evidence was presented to show these involved the use or threat of violence to the person.

¶ 55 The word "prior" does not mean "prior to the crime charged." Nothing in the statutory language bars the State from introducing evidence of violent felonies committed by the defendant after the crime charged and before trial. 21 O.S.1991, § 701.12(1). See also Grasso v. State, 1993 OK CR 33, ¶ 25, 857 P.2d 802, 808–09. The State must, however, present evidence to prove the prior felonies involved the use or threat of violence to the person. Cleary v. State, 1997 OK CR 35, ¶ 38, 942 P.2d 736, 746–47, cert. denied, —— U.S. ——, 118 S.Ct. 1528, 140 L.Ed.2d 679 (1998). The State did not do so in this case.

¶ 56 We need not consider the effect of this error, for the trial court committed an instructional error which cured it. The trial court instructed the jury that the prior felony conviction in support of this aggravating circumstance must have occurred prior to the Dodd murder. As two qualifying prior felony convictions were presented to the jury, we find the State's error, failing to prove the escape and its facilitation were violent, is harmless.

¶ 57 In Proposition XIII Miller argues he was denied a fair trial by the introduction of evidence of unadjudicated crimes through witnesses who could not positively identify him at trial. While it is true that two of these witnesses failed to positively identify Miller at trial, and one failed to identify him at the time of the crime, other evidence presented was sufficient to identify him as the perpetrator of these crimes.

¶ 58 The first contested unadjudicated crime was an attempted purse snatching in a hospital waiting room in Texas. The investigating officer testified Miller confessed this crime to him verbally, with the understanding that under Texas law a verbal confession is not admissible at trial. The second unadjudicated crime was the stealing of a wallet while the male victim used the urinal in a Burger King restaurant. While the victim could not identify Miller, a restaurant employee identified Miller as the man who walked toward the rest room immediately before the patron reported he had been robbed.

¶ 59 The third unadjudicated crime was a purse snatching from the proprietor of an art gallery. The proprietor met with Miller for approximately half an hour before he pushed her down and took her purse. She did not identify him at a subsequent one-man show-up, but after seeing his picture in the newspaper four months later, made a positive in-court identification. The defense did not request an eye-witness identification instruction.

¶ 60 The evidence as to each of these three incidents is sufficient to identify Miller as the perpetrator of these unadjudicated offenses. There is no error here.

¶ 61 In Proposition XIV Miller argues the jury instruction on the continuing threat aggravating circumstance relieved the State from proving every element of the aggravator by requiring the jury to find "a probability" that Miller constituted a continuing threat to society. This semantic argument disregards the clear statutory language. This aggravating circumstance is

defined by statute as "[t]he existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." 21 O.S. 1991, § 701.12(7). Thus, the jury must find this probability beyond a reasonable doubt. The trial court's instruction is correct *Hawkins v. State,* 1994 OK CR 83, ¶ 40, 891 P.2d 586, 596, *cert. denied,* 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995).

¶ 62 Miller also argues the continuing threat aggravating circumstance is unconstitutionally vague. We consistently find this aggravating circumstance properly narrows the class of death eligible defendants and is not impermissibly vague. *Johnson v. State,* 1996 OK CR 36, ¶ 29, 928 P.2d 309, 316, *cert.denied,* —— U.S. ——, 118 S.Ct. 99, 139 L.Ed.2d 54 (1997); *Snow v. State,* 1994 OK CR 39, ¶ 28, 876 P.2d 291, 298, *cert.denied,* 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995). We find no reason to revisit this holding.

¶ 63 In Proposition XV Miller argues there is insufficient evidence to prove a predicate crime which would support a finding the murder was committed to avoid arrest or lawful prosecution. Evidence presented at trial was sufficient to prove the victim's wallet as well as ten dollars given to him by the manager was missing, along with $122.01 from the motel cash drawer. Before he died, Dodd told the police, and two officers heard him say three or four times, "He robbed me." This evidence is sufficient to prove the predicate crime and the fact Dodd was a witness to it.

¶ 64 Miller also argues the aggravator must be stricken for the State failed to set forth the predicate crime in the Bill of Particulars. In lieu of details of the predicate crime the State asserted, "[t]he State will move to incorporate the evidence in stage one into stage two to prove this aggravating circumstance." The State then set forth the evidence which it would use to show Miller tried to eliminate a witness. The question before us is whether this notice is sufficient.

¶ 65 Title 21 O.S.1991, § 701.10 provides that during the penalty phase of trial only such evidence in aggravation as the State has made known to the defendant prior to his trial shall be admissible. This Court held in *Wilson v. State,* 1988 OK CR 111 n. 1, 756 P.2d 1240, 1245 n. 1 that § 701.10 does not require the State to give a detailed description of the evidence that will be offered in the second stage. Notice is sufficient if it allows the defendant the opportunity to present a defense or explanation for the alleged criminal conduct. *Johnson v. State,* 1982 OK CR 37, ¶ 36, 665 P.2d 815, 823. To this end the notice must contain a summary of the evidence intended to be used to support the alleged aggravating circumstance as well as a list of the witnesses the State might call. *Williamson v. State,* 1991 OK CR 63, ¶ 112, 812 P.2d 384, 408, *cert. denied,* 511 U.S. 1115, 114 S.Ct. 2122, 128 L.Ed.2d 677 (1994); *Walker v. State,* 1986 OK CR 116, ¶ 48, 723 P.2d 273, 285, *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986). The State's notice, while not exemplary or artful, is sufficient.

¶ 66 Miller raises three arguments in Proposition XVI to contest the jury finding of the "heinous, atrocious or cruel" aggravating circumstance. First, he argues the aggravator is unconstitutionally vague and overbroad, recognizing this Court rejects this argument. We find no reason to revisit this issue at this time. *See, Johnson,* 1996 OK CR 36, ¶ 28, 928 P.2d at 316, *Cheney v. State,* 1995 OK CR 72, ¶¶ 14–15, 909 P.2d 74, 80.

¶ 67 Miller argues the evidence supporting this aggravator is insufficient because no gratuitous violence was proven. He overlooks the fact the victim died of blunt force trauma to the head inflicted by a paint can, and muriatic acid was poured on his face and down his throat while he was alive. The use of acid in this case is an intentional act of violence beyond the homicidal act. We reject this argument.

¶ 68 The trial court misinstructed the jury on the definition of "heinous, atrocious, or cruel." The court should have instructed the jury this aggravating circumstance is directed to those crimes "where death of the victim was preceded by torture of the victim or serious physical abuse." Oklahoma Uniform Jury Instructions–Criminal 2d, 4–73. The trial court omitted the word "physical," and neither party objected.

Miller argues the omission of this word invalidates his death sentence. We disagree. The omission of the word "physical," while error, does not alter the State's burden of proof, and is harmless. *Johnson,* 1996 OK CR 36, ¶¶ 38–42, 928 P.2d at 318.

¶ 69 Miller raises two arguments against victim impact evidence in Proposition XVII. He argues the evidence is in effect an unconstitutional "super aggravator," and he argues the victim impact evidence admitted in this case was outside the statutory definition. This Court has rejected the "super aggravator" argument consistently. *Hooper v. State,* 1997 OK CR 64, ¶ 34, 947 P.2d 1090, 1104, *cert. denied,* —— U.S. ——, 118 S.Ct. 2353, 141 L.Ed.2d 722 (1998); *Willingham v. State,* 1997 OK CR 62, ¶ 61–62, 947 P.2d 1074, 1086–87, *cert. denied,* —— U.S. ——, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998); *Toles v. State,* 1997 OK CR 45, ¶ 36, 947 P.2d 180, 188, *cert. denied,* —— U.S. ——, 118 S.Ct. 2380, 141 L.Ed.2d 746 (1998). We find no reason to revisit this issue.

 ¶ 70 Victim impact evidence is supposed to be limited to the impact of the murder on the family of the victim. 21 O.S.Supp.1992, § 701.10(C). Mrs. Dodd, the mother of the victim, testified to two dreams in which her dead son appeared to her. In one, he asked "are we going to trial?" She testified she "just held him because I had nothing to tell him." In the second dream her son expressed concerns about the trial. This is outside the statutory scope of victim impact evidence. Inasmuch as no objection was made at trial to this statement, we review for plain error only. Given the body of Mrs. Dodd's statement in which she described the loss within statutory limits, and given the fact each of the aggravating circumstances is supported by strong evidence, we find this excess harmless. See *Al–Mosawi v. State,* 1996 OK CR 59, ¶ 66, 929 P.2d 270, 285; *Hain v. State,* 1996 OK CR 26, ¶ 76, 919 P.2d 1130, 1149.

¶ 71 Miller raises seven issues in Proposition XVIII which he concedes are settled against him in this jurisdiction. He raises them for purposes of federal appeal. In the first he argues mitigation evidence is diminished when the trial court instructs the jury it *must* consider evidence in aggravation and *may* consider evidence in mitigation. We

disagree. See *Johnson v. State,* 1996 OK CR 36, ¶ 31, 928 P.2d 309, 317.

¶ 72 Miller claims the trial court erred by failing to instruct the jury it could impose life or life without possibility of parole even if it found an aggravating circumstance. This argument is consistently rejected. See *Bryson v. State,* 1994 OK CR 32, ¶ 64, 876 P.2d 240, 262–63, *cert. denied,* 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995).

¶ 73 Miller challenges the instruction advising the jury how to weigh the evidence in aggravation and mitigation. He claims the instruction allows the jury to weigh the aggravators in aggregate against each mitigating circumstance. We disagree. See *Allen v. State,* 1994 OK CR 13, ¶ 87, 871 P.2d 79, 101, *cert. denied,* 513 U.S. 952, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994).

¶ 74 Next, Miller argues Oklahoma's death penalty scheme is unconstitutional. Again, we disagree. See *Fields v. State,* 1996 OK CR 35, ¶ 71, 923 P.2d 624, 637, *cert. denied,* —— U.S. ——, 117 S.Ct. 1704, 137 L.Ed.2d 829 (1997).

¶ 75 Miller's argument that the jury is unconstitutionally required to make special findings of fact when it determines the death sentence has been rejected. See *Duckett v. State,* 1995 OK CR 61, ¶ 91, 919 P.2d 7, 27.

¶ 76 We find the trial court did not err by denying the defense request to present evidence on the cost-effectiveness of a sentence of life without possibility of parole compared to a sentence of death. See *Smallwood v. State,* 1995 OK CR 60, ¶ 62, 907 P.2d 217, 233, *cert. denied,* —— U.S. ——, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996).

¶ 77 Finally, the trial court did not err by denying an instruction to the jury on the presumption of life. See *Duckett,* 1995 OK CR 61, ¶ 63, 919 P.2d at 22.

¶ 78 In Proposition XIX Miller claims he was denied effective assistance of counsel. He cites four alleged inadequacies of counsel. The first is that counsel did not object to the late filing of the Bill of Particulars. As we discussed in the first proposition, counsel represented to his client and the trial court he would be ready for trial. The filing of the Bill of Particulars at the normal procedural

time, upon arraignment, did not prejudice Miller. Miller also argues the failure to object to the admission of DNA and shoe print evidence is evidence of ineffective assistance. As we have found this evidence was properly admitted, an objection to it would have been futile. Miller asserts counsel did not object to prosecutorial misconduct. In fact, counsel did object and was sustained a number of times. The great majority of statements which appellate counsel claims are misconduct, are in fact within the bounds of zealous representation. Finally, Miller asserts trial counsel did not adequately investigate and present mitigation evidence. Appellate counsel does not reveal what other evidence might have been presented, but argues generally all possible sources were not checked. Without more than mere speculation, we will not find error.

¶ 79 In Proposition XX Miller argues the cumulative error in this case warrants reversal. We have identified error in this case: 1) the trial judge did not hold a hearing to determine the admissibility of the DNA evidence; 2) an evidentiary harpoon informed the jury Miller had been physically abusive to his wife; 3) the State presented two crimes not shown to involve the use or threat of force against a person to support the "prior violent felony conviction" aggravator; 4) the trial court omitted the word "physical" from the definition of "heinous, atrocious or cruel" as directed at those crimes which involve "torture or serious physical abuse"; and, 5) the victim impact statement made by Mrs. Dodd contained inadmissible references to her dead son appearing to her in dreams. Each of these errors were found to be harmless.

¶ 80 We find these errors gather no force in aggregate. The DNA evidence is admissible and therefore this error has no effect whatsoever. The information injected by the evidentiary harpoon was admissible and in fact was explained in some detail by Mrs. Miller when she testified. The harpoon therefore changed the timing of the introduction of the evidence, but did not change the content of the information properly known by the jury. The trial court instructed the jury in such a way that it did not consider the convictions for escape and conspiracy to escape in support of the aggravating circum-

stance, "prior conviction of a felony involving the use or threat of force against a person." Therefore, the error of failing to determine whether these crimes involved the use or threat of force had no effect on the trial.

¶ 81 Under the circumstances of this trial, the omission of the word "physical" from the limiting definition for heinous, atrocious, or cruel is harmless. The quantum of abuse did not change, and the only abuse proven to be suffered by the victim was physical. Mrs. Dodd's testimony about her son appearing to her in her dreams is outside the bounds of victim impact evidence. However, inasmuch as the proper victim impact evidence regarding her loss was much more compelling, the dream information could have had no prejudicial effect. The identified errors do not affect the body of evidence or the standard of proof in this case. They do not interject passion or doubt into the trial. Consequently, we find they gain no weight in aggregate.

## MANDATORY SENTENCE REVIEW

¶ 82 In every capital murder case this Court conducts a final analysis to determine whether the evidence supports the jury's finding of aggravating factors, and whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. 21 O.S.1991, § 701.13(C). We now conduct this mandatory sentence review.

¶ 83 The jury found four aggravating circumstances: 1) at the time of the crime the defendant was previously convicted of a felony involving the use or threat of violence to the person; 2) the murder was especially heinous, atrocious, or cruel; 3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and, 4) at the present time there exists a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

¶ 84 In support of the first aggravator, the State introduced testimony and the Judgment and Sentence to prove prior convictions for first degree burglary and robbery which each involved the use and threat of violence to a person. The second aggravating circum-

stance was proven beyond a reasonable doubt by the fact Miller poured acid on the face of the living victim and down his throat and inflicted a serious physical beating and the fact that the victim lived for sometime while enduring serious pain and suffering. This is gratuitous violence sufficient to establish Miller subjected the victim to serious physical .abuse. The evidence established that Miller took money from Kent Dodd, and that Kent Dodd knew and could identify Miller. This evidence proves beyond a reasonable doubt the purpose of avoiding or preventing lawful arrest or prosecution. The "continuing threat" aggravating circumstance was proven by the introduction of evidence of a conviction for first degree burglary, robbery, escape, conspiracy to escape, and felon in possession of a firearm. The State also proved three unadjudicated robberies. This evidence is sufficient to prove the "continuing threat" aggravator.

█ ¶ 85 The only error which possibly injected passion or prejudice into the trial was the testimony of the victim's mother in which she recounted two dreams in which her dead son appeared to her. However, in the emotionally wrenching but fair context of the parents' testimony regarding their anguish caused by the murder of their son, this testimony could not have had any improper influence on the jury. We find the aggravating factors are supported by the evidence, and the sentence of death is not influenced by passion, prejudice, or any arbitrary factor.

### DECISION

The Judgment and Sentence of the trial court is **AFFIRMED.**

CHAPEL, P.J., STRUBHAR., V.P.J., and JOHNSON, J., concur.

LUMPKIN, J., concurs in results.

LUMPKIN, Judge: concur in results.

¶ 1 I agree that Appellants conviction and sentence should be affirmed. I write separately because I do not agree with the standard of review the Court uses here to determine the sufficiency of the evidence, and some of the analysis utilized by the Court.

¶ 2 I have previously stated my belief this Court should adopt a unified Spuehlertype approach to evaluating the sufficiency of the evidence in all cases, whether they contain both direct and circumstantial evidence, or whether they contain entirely circumstantial evidence. *See White v. State,* 900 P.2d 982 (Okl.Cr.1995) (Lumpkin, J., specially concurring). I re-urge that here because this case presents a prime example why a unified approach would be clearer and more concise.

¶ 3 In addition, as a part of its discussion of Proposition I, the Court incorrectly cites *Carter v. State,* 1994 OK CR 49, ¶ 53, 879 P.2d 1234, 1251, for the holding that "[a]n abuse of discretion in the filing of a Bill of Particulars will be found where the filing is based on impermissible discriminating grounds." This Court in *Carter* did not make that statement. We did say that in accordance with our holding in *Romano v. State,* 847 P.2d 368, 392 (Okl.Cr.1993), "it was the obligation of a criminal defendant to demonstrate that the governments prosecution of him was based upon impermissible discriminating grounds citing to *United States v. Blitstein,* 626 F.2d 774, 782 (10th Cir.1980)." In *Romano,* we recognized "[p]rosecutors are presumed by law to act in good faith when determining which crimes to prosecute and which punishments to seek [citations omitted.]" We stated:

> The decision regarding which criminal charge to bring lies within the wide parameters of prosecutorial discretion. *Gray v. State,* 650 P.2d 880, 882 (Okl.Cr.1982). *See also Dangerfield v. State,* 742 P.2d 573 (Okl.Cr.1987). However, prosecutorial discretion is not unlimited. In *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978), the Supreme Court stated:
>> the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation so long as the selection was [not] deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification.

*Romano,* 847 P.2d at 393.

¶ 4 As I have stated many times before, this Court must be accurate and consistent in the application of its precedent. Too often slight variations in wording of holdings or improper paraphrasing of holdings leads to

unsupported conclusions that we have departed from our prior caselaw. Our responsibility is to be clear in our decisions. We are tasked with the obligation to clarify, not confuse, the rule of law.

¶ 5 Finally, I disagree with the Courts finding in Proposition VII that Detective Craig Gravels response to the cross-examination by defense counsel was an evidentiary harpoon. When the entirety of the line of questioning is read in context, it is readily apparent the response was germane to the questions asked, and while it could be construed to be information of other crimes, it was in response to the question asked regarding when she had asked Appellant to leave the house on the night in question.